IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHERMAN & ASSOCIATES, INC. ET AL., | No. C 11-00827 CRB |
| Plaintiffs, | **ORDER GRANTING MOTION TO DISMISS** |
| v. | |
| OXFORD INSTRUMENTS, PLC ET AL., | |
| Defendants. | |

Plaintiff Sherman & Associates ("Sherman") has sued Defendant Oxford Instruments for patent infringement. See generally Compl. (dkt. 5). Defendant Patent Owner ASM America ("ASM") has filed a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(1), arguing that Sherman lacks standing to sue for patent infringement because it does not have the necessary ownership interest in the patents. See generally Mot. (dkt. 27).[1] As explained below, the Court GRANTS ASM's Motion.

## I. BACKGROUND

In 2006, in order to settle prior litigation that arose from a dispute regarding royalties on a sub-license ASM had issued,[2] Reply at 6, ASM and Sherman entered into a written contract whereby Sherman transferred to ASM title to a number of Sherman's patents, one of

---

[1] Defendant Oxford Instruments joins in ASM's Motion. See dkt. 43.

[2] The prior litigation between ASM and Sherman took place in front of Judge Whyte. See Sherman & Assoc., Inc. v. ASM Int'l N.V. et al., Case No. 05-5008. Judge Whyte recently declined to relate the two case. See dkt. 53.

which is the patent at issue in this case, Mot. at 3. In the contract, ASM granted Sherman "a non-assignable, nontransferable worldwide exclusive right to grant sublicenses under the Sherman Patents in fields of use other than the field of Microelectronic Applications." Id. (citing Bunsow Decl. Ex. A (Contract) at 1(d)). Sherman was to "require that sublicensees pay a reasonable royalty" and Sherman was to "pay to ASM thirty-three percent (33%) of all license fees and royalties realized." Bunsow Decl. Ex. A (Contract) at 1(d). Sherman was also "to keep and preserve during the term of this Settlement Agreement accurate records of all sublicenses" that Sherman granted. See id. at 5. The contract did not grant Sherman a right to practice the patent. Sherman Decl. ¶ 15. As to litigation, the contract provided:

> Sherman agrees to cooperate and assist ASM in any litigation involving the Sherman Patents on reasonable terms and conditions to be agreed upon. Sherman also agrees to assist ASM in patent prosecution relating to the Sherman Patents at no cost to ASM. ASM will pay all prosecution costs and will reimburse Sherman for any out of pocket costs.

Bunsow Decl. Ex. A (Contract) at 1(g). The contract said nothing about Sherman initiating litigation involving the patents, although Sherman represents now that he always understood that he "would be able to initiate litigation against third parties to enforce the sublicensing rights granted under" the contract and "would not have entered into [the contract] if it did not give [him] the right to sue third parties for infringement in fields outside of microelectronics applications." Sherman Decl. ¶¶ 13-14.

Sherman has now brought suit for patent infringement against Defendant Oxford Instruments, and has named ASM as "Defendant Patent Owners." See generally Compl. ASM has moved to dismiss based on lack of standing. See generally Mot.

## II. LEGAL STANDARD

Constitutional standing is a jurisdictional limit imposed by Article III § 2 of the Constitution. See Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11 (2004). Because standing "pertain[s] to a federal court's subject-matter jurisdiction under Article III, [a challenge to standing is] properly raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1)." White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000).

2

1    To meet the minimum constitutional standing requirement, a plaintiff must show
2    injury in fact, traceability and redressability. Morrow v. Microsoft Corp., 499 F.3d 1332,
3    1339 (Fed. Cir. 2007). In patent cases, the legal interests that form the basis for alleging
4    injury in fact come from the patent statutes, which grant patent owners the legal right to
5    exclude others from making, using, selling, or offering to sell or importing the patented
6    invention. Id. (citing 35 U.S.C. §§ 154, 271). "Constitutional injury in fact occurs when a
7    party performs at least one prohibited action with respect to the patented invention that
8    violates these exclusionary rights." Id. One must hold exclusionary rights to the patent in
9    order to suffer legal injury in fact under the statute. Id. "It is the licensee's beneficial
10   ownership of a right to prevent others from making, using, or selling the patented technology
11   that provides the foundation for . . . standing, not simply that the word 'exclusive' may or
12   may nor appear in the license." See Ortho Pharm. Corp. v. Genetics Inst., Inc., 52 F.3d 1026,
13   1032 (Fed. Cir. 1995).

## III.   DISCUSSION

15   The Federal Circuit recognizes three categories of licensees in relation to
16   constitutional standing. See Morrow, 499 F.3d at 1339. The first category "hold all legal
17   rights to the patent . . . – the entire bundle of sticks." Id. Such licensees have constitutional
18   standing to sue for infringement in their own name. Id. at 1339-40. The second category
19   "hold exclusionary rights and interests created by the patent statutes, but not all substantial
20   rights to the patent." Id. at 1340. Because they hold some exclusionary rights, they are
21   "injured by any party that makes, uses, sells, offers to sell, or imports the patented
22   invention." Id. They are "often identified as exclusive licensees, because the grant of an
23   exclusive license to make, use, or sell the patented invention carries with it the right to
24   prevent others from practicing the invention." Id. Such licensees must enforce their
25   exclusionary rights in the name of the patent owner, and must join the patentee for the
26   purpose of avoiding duplicative litigation. Id. The third category "hold less than all
27   substantial rights to the patent and lack exclusionary rights under the patent statutes." Id.
28   Because they do not hold exclusionary rights, they "are not injured by a party that makes,

3

United States District Court
For the Northern District of California

uses, or sells the patented invention." Id. at 1341. Their standing deficiency cannot be cured by adding the patentee to the suit. Id.

The question in this case is whether Sherman falls within the second or third category of licensees.[3] ASM argues that Sherman belongs in the third category, because "Sherman's rights are limited to licensing," Sherman "was not given a license to make, use, sell, offer to sell or import the invention," and "ASM retained most of the rights incident to ownership of a patent." Mot. at 3. ASM maintains that Sherman has no exclusionary rights in the patent, and therefore no standing to sue for patent infringement. Id. at 5-8. Sherman disagrees, claiming that he belongs in the second category, because (1) he has exclusionary rights, (2) the primary case upon which ASM relies, Propat Int'l Corp. v. Rpost US, Inc., 473 F.3d 1187 (Fed. Cir. 2007), is distinguishable, and (3) the parties intended for Sherman to enforce his sublicensing rights. This Order will address each of Sherman's arguments in turn.

### A. The Agreement Does Not Give Sherman Exclusionary Rights

Sherman argues, primarily, that because he has an exclusive right to sublicense the patent, he necessarily also has a right to exclude others from using the patent. He asserts,

> it is incredible that either party . . . would enter into the dysfunctional agreement ASM now argues for – one which, under ASM's interpretation, provided that: a) if Sherman sought to license a company infringing his patents in his field of use, he could not sue them if the infringer preferred to free ride on his patents; and b) the ASM parties had the right to sue in Sherman's field of use, but could not settle the case by granting a license to the alleged infringer.

Opp'n (dkt. 49) at 1-2. He concludes that "it necessarily follows from Sherman's exclusive sublicensing right that Sherman has the right to practice and to enforce the [patent] in the field of non-microelectronics applications and nothing the 2006 Agreement provides to the contrary." Id. at 2. Although this argument has initial appeal, the Court disagrees with it.

#### 1. Right to Practice

Sherman acknowledges that the Agreement did not include an express provision granting him the right to use the patent, but explains that he "did not have an ongoing manufacturing or research business" in 2006 when the Agreement was reached. Opp'n at 6-

---

[3] Because ASM owns the patent and only granted Sherman the "exclusive right to sublicense" the patent, neither party argues that he falls within the first category.

4

7. He maintains, however, that "nothing in the 2006 Agreement prevents [him] from practicing the [patent] in his field of use, and nothing in the 2006 Agreement prevents [him] from granting a sublicense in his field of use to himself or his company if need be." Id. at 7. He adds: "Sherman must have the right to practice the [patent] in the field of microelectronics applications, because this is the very right he is empowered to grant." Id. at 10 (citing Prima Tek II, LLC v. A-Roo Co., 222 F.3d 1372, 1382 (Fed. Cir. 2000)).

This last point is correct but insufficient. Although Sherman could grant himself the right to practice, he could not grant himself an exclusive right to practice. He cannot grant more than he received, and he never received the right to exclude others or to grant exclusivity to others. See Mot. at 6 n.3.[4] Although neither party addresses this point, the Court finds it significant that the contract provides:

> Sherman agrees and hereby grants to ASM and its Subsidiaries a royalty-free, fully paid-up, non-exclusive, worldwide license under the Sherman Patents in all fields, including outside of the field of Microelectronic Applications, to make, have made, use, sell, offer for sale, lease, test, repair or otherwise dispose of products that practice any inventions claimed by or that are otherwise covered by the Sherman Patents.

Bunsow Decl. ¶ 1(e) (emphasis added). If ASM has a license to use the patent in Sherman's field, then no license Sherman could grant to himself could be exclusive. See Mars, Inc. v. Coin Acceptors, Inc., 527 F.3d 1359, 1368 (Fed. Cir. 2008) ("[t]o be an exclusive licensee for standing purposes, a party must have received, not only the right to practice the invention . . . but also the patentee's express or implied promise that others shall be excluded from practicing the invention.").

Moreover, as ASM argues, the contract explicitly states that ASM has the right to practice in all fields, and is silent on Sherman's right to practice. Reply (dkt. 47) at 4. The Court accepts Sherman's assertion that the contract is silent on that right because he did not have a manufacturing or research business when the contract was written. Opp'n at 6-7.

---

[4] Sherman contends that his "status as an exclusive licensee does not depend on having an 'exclusive' license to practice, but rather Sherman's status exists because of its exclusive sublicensing rights in a field of use." Opp'n at 11 n.6. This argument is unavailing, particularly as a response to the argument that he must have an exclusive license to make, use, or sell the patented invention. Sherman's exclusive sublicensing right is insufficient, see Ortho Pharm. Corp., 52 F.3d at 1032 (word "exclusive" is not determinative), and a non-exclusive right to practice does not exclude others.

5

1 Given that assertion, however, it makes little sense to argue that the parties intended to write
2 into the contract a right to practice that Sherman could not use. The Court is also wary of
3 reading a term into the agreement that is not there. See Stockton Dry Goods Co. v. Girsh,
4 227 P.2d 1, 3 (Cal. 1951).

Accordingly, the Court does not interpret the contract as providing Sherman with an exclusive right to practice the patent.

### 2. Right to Enforce

Sherman further asserts that by virtue of his exclusive right to sublicense the patent, he also has the right to enforce the patent through litigation. Opp'n at 11-12. He objects to ASM's statement that he has "a right to permit others to practice and not the right to exclude," and argues that he, and not ASM, is empowered to initiate litigation against infringers. Id. at 12. At first glance, it does seem odd that Sherman should have the right to grant sublicenses to potential infringers, but not to sue them if they prefer infringing to paying for a license. This is especially so if one reads the contract, as Sherman does, as defining two separate spheres of responsibility (microelectronics for ASM and non-microelectronics for Sherman) – why would ASM be responsible for litigating infringement in non-microelectronics fields?

But ASM's right to litigate the patent in non-microelectronic fields is based not on its role as "non-exclusive licensee" of the patent, see id., but on Sherman's having assigned "to ASM all rights, titles and interests in and to all Sherman Patents," Bunsow Decl. ¶ 1(c), and then on ASM's having granted to Sherman only the "exclusive right to grant sublicenses," id. at ¶ 1(d). The contract therefore begins by giving ASM the entire bundle of sticks, see Morrow, 499 F.3d at 1339, and then from that bundle returns to Sherman just one: the right to sublicense. If the contract doesn't give Sherman the right to litigate, he doesn't have it.[5]

Although Sherman asserts that he "understood and intended that he would be able to initiate litigation against third parties to enforce his sublicensing rights," Opp'n at 6, the

---

[5] Sherman's conclusion that "ASM appears to have effectively transferred all substantial rights to [the patent] in the field of non-microelectronics applications to Sherman," Opp'n at 12, therefore finds no support in the contract.

6

contract says nothing about Sherman's right to litigate. The only language in the contract about litigation anticipates that ASM will be litigating, and does not limit such litigation to the field of microelectronics. See Bunsow Decl. Ex. A ¶ 1(g) ("Sherman also agrees to assist ASM in patent prosecution relating to the Sherman Patents at no cost to ASM."). Sherman argues that the paragraph about litigation contains no reciprocal language because he is the inventor of the patent and would not need any assistance from ASM in prosecuting a patent. Opp'n at 16. That is plausible, but it is no more plausible than ASM's suggestion that the parties did not intend for Sherman to do any litigating.

Sherman argues, too, that "he must have the right to exclude non-sublicensees from practicing [the patent] in his exclusive field, or else the sublicensing right would be meaningless." Id. at 11. But it is not actually true that no one could enforce the patent in Sherman's absence; ASM could. As it points out in its papers, "ASM has a financial interest in having third-parties license this field as it receives 33% of Sherman's licensing fees." Reply at 1.[6] So, if Sherman's sublicensing efforts are unsuccessful, ASM can threaten suit, and if ASM threatens suit, Sherman can swoop in and offer a sublicense. Id.

Sherman believes that the right to sublicense and the right to enforce are inextricably intertwined. He quotes Morrow, which held that "implicit in the right to exclude is the right to waive that right; that is, to license activities that would otherwise be excluded." Opp'n at 11 (citing Morrow, 499 F.3d at 1342). But it does not follow that because one has the right to license, he also has the right to exclude. That was essentially the holding of Propat, 473 F.3d at 1190-91, where the patent licensee was also granted an exclusive right to grant sublicenses, and where the contract even purported to grant the licensee a right to sue, but the Federal Circuit nonetheless held that the licensee lacked standing to sue for infringement because it did not have the right to exclude others.

---

[6] The Court recognizes that ASM also has great discretion not to litigate, and so Sherman has no guarantee that there is a stick (litigation) to go with his carrot (sublicensing). This case is a good example of that. Nonetheless, the Court is not in the business of rewriting parties' contracts.

7

Accordingly, the Court concludes that Sherman does not have a right to litigate the patent,[7] or to enforce it.

### B. Propat Cannot be Meaningfully Distinguished

There are significant similarities here to Propat. In that case, as here, the licensee had a license to grant sublicenses. 473 F.3d at 1190. The agreement there, as here, did "not assign [the licensee] the right to make, use and sell the patented invention" but merely gave it the "right to enforce or license other parties to use, manufacture, or sell" the invention." Id. The contract there, as here, was silent as to the licensee's right to practice the patent. Id. at 1194. The licensee there, as here, had limited ability to transfer its rights under the agreement. Id. at 1191. And the patent owner there, as here, could terminate the agreement and end all of the licensee's rights in the patent under certain circumstances. Id. at 1191-92.

Sherman seeks to distinguish Propat, arguing that the Federal Circuit there based its conclusion on "certain critical restrictions on the rights granted to the licensee" not present here. Opp'n at 13. The restrictions on the licensee in Propat were indeed more restrictive. For example, Sherman need not get ASM's consent before granting a sublicense. In contrast, the licensee in Propat had to receive the consent of the patent owner before licensing or suing third parties. Morrow, 499 F.3d at 1342-43; Propat, 473 F.3d at 1190-91. But the consent in Propat "could not be unreasonably withheld," see Morrow, 499 F.3d at 1343, and the Federal Circuit has held that such a consent requirement is "not significantly restrictive of . . . exclusionary rights," id. at 1342.

In addition, Sherman need to meet any licensing benchmarks under the contract, though he is required to give ASM a percentage of his royalties, to keep an accurate accounting of the royalties and to make royalty payments to ASM in a timely fashion.

---

[7] Despite their extensive debate on this topic, the parties agree that the right to litigate is somewhat beside the point, and the right to exclude is what matters. See Opp'n at 10 ("mere 'right to sue' does not grant standing at all"); Reply at 8 (describing as "inapposite" Sherman's argument about the right to sue). Even if the contract expressly gave Sherman the right to sue, a contractual right to sue and a legal proprietary right are independent things, and the former does not guarantee the latter. See Propat, 473 F.3d at 1192 ("It has long been held that a 'right to sue' clause in a contract, unaccompanied by the transfer of other incidents of ownership, does not constitute an assignment of the patent rights that entitles the transferee to sue in its own name.").

8

Bunsow Decl. Ex. A ¶ 1(d), 5. In contrast, the licensee in Propat was required to meet certain benchmarks, and if it did not, the patent owner was "free to terminate the contract." 473 F.3d at 1191. This is an area in which Propat is indeed more restrictive. Although ASM may terminate Sherman's rights if he breaches any material provision of the contract, failure to meet benchmarks is not a basis of termination, and certain procedures must be followed in the event of a breach, such as a sixty day period for Sherman to cure the breach, and participation in a binding arbitration process. See Bunsow Decl. Ex. A ¶ 4. That does not mean, as Sherman suggests, that ASM could never terminate the contract, see Opp'n at 14 ("ASM gives no reason to believe that there would ever be grounds for a material default"), just that there is less opportunity for it to do so.

Sherman concedes that he is not permitted to transfer or assign his sublicensing right at all, which is more restrictive than in Propat, 473 F.3d at 1191, where the licensee could transfer his rights but the patent owner could veto any such transfer. Opp'n at 15. He argues, though, that this one factor "alone should not lead to the conclusion that Sherman lacks ownership rights in [the patent], in view of the other factors that indicate to the contrary. Id. Notably, not only may Sherman not transfer his rights, but the contract states that Sherman's rights will automatically terminate upon his death, merger, acquisition, or the liquidation of Sherman & Associates. Bunsow Decl. Ex. A ¶ 1(d). This is a significant restriction, as the Federal Circuit in Propat described the right to transfer an interest as an "important indicia of a true ownership interest in [a] patent." 473 F.3d at 1194.

On balance, the restrictions on the licensee in Propat are greater than those the contract here places on Sherman. But the licensee in Propat also had something that Sherman does not: a contractual right to sue infringers. See 473 F.3d at 1190 ("the agreement . . . gives [licensee] the responsibility to license the patent to third parties, to enforce the licensing agreements, and to sue infringers."). Notwithstanding that contractual right, the Federal Circuit agreed with the lower court that "in light of the various rights retained by" the patent owner, the licensee "was not transferred all substantial rights and, as

9

such, has no standing to sue." Id.; id. at 1194. Here, too, ASM started with the "entire bundle of sticks" and did not give very much back to Sherman.

Although there are factual differences between this case and Propat, Sherman has failed to meaningfully distinguish that case.

### C. Sherman's Arguments about the Parties' Intentions Fail

Finally, Sherman argues that the parties intended for him to be able to enforce his exclusive sublicensing rights. See Opp'n at 15-18. This Order has already addressed two of Sherman's arguments on this point: that the paragraph about litigation, Bunsow Decl. Ex. A ¶ 1(g), is not as significant as ASM claims; and that ASM is only a non-exclusive licensee and cannot initiate suit, see Opp'n at 16-17. Sherman also argues that the "extrinsic evidence demonstrates that the parties contemplated that Sherman would be able to enforce his exclusive sublicensing rights." Id. at 17. It does not, but it is also inadmissible. California Code of Civil Procedure section 1856(a)-(b) provides that terms set forth in a writing intended to be a final expression of agreement cannot be contradicted by evidence of a prior agreement, or even explained or supplemented, if the writing is intended "as a complete and exclusive statement of the terms of the agreement." The contract here provides: "This Settlement Agreement contains the entire and only understanding between the parties pertaining to the subject matter contained in it and supersedes any and all prior and/or contemporaneous oral or written negotiations, agreements, representations and understandings including without limitation the License Agreement and the Terms of Settlement." Bunsow Decl. Ex. A ¶ 13. Such language demonstrates the parties' intent for the contract to be the complete and exclusive terms of the agreement, and so the Court will not consider the extrinsic evidence.

Accordingly, these arguments also fail to undermine the language in the contract, which does not grant Sherman any exclusionary rights in the patent.

### IV. CONCLUSION

For the foregoing reasons, the Court concludes that Sherman holds less than all substantial rights to the patent and lacks exclusionary rights under the patent statutes.

10

See Morrow, 499 F.3d at 1340. He is therefore "not injured by a party that makes, uses, or sells the patented invention," see id. at 1341, and lacks standing to sue third parties for patent infringement. The Court GRANTS the Motion, and DISMISSES the case.

**IT IS SO ORDERED.**

Dated: January 10, 2012

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE